# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2090

_____

| | | |
|---|---|---|
| Brant Sitzes, Individually & as Joint | * | |
| Administrator of Estate of Brittney Rae | * | |
| Sitzes, Deceased; & as Parent & Next | * | |
| Friend of Shelby L. Sitzes, a Minor; | * | |
| Nancy Sitzes, Individually, as Joint | * | |
| Administrator of Estate of Brittney Rae | * | |
| Sitzes, Deceased, & as Parent & Next | * | |
| Friend of Shelby L. Sitzes, a Minor., | * | |
| | * | |
| Plaintiffs - Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Eastern District of Arkansas. |
| City of West Memphis Arkansas; | * | |
| William H. Johnson, Individually & in | * | |
| Official Capacity as Mayor of West | * | |
| Memphis, AR; Robert Paudert, | * | |
| Individually & in Official Capacity as | * | |
| Chief of Police, West Memphis, AR; | * | |
| James Wright, Individually & in | * | |
| Official Capacity as Police Officer in | * | |
| West Memphis, AR; Arkansas | * | |
| Municipal League; West Memphis City | * | |
| Council, | * | |
| | * | |
| Defendants - Appellees. | * | |

_____

Submitted: January 15, 2010
Filed: June 4, 2010

_____

Before GRUENDER and SHEPHERD, Circuit Judges, and LANGE,[1] District Judge.
_____

SHEPHERD, Circuit Judge.

Appellants Brant and Nancy Sitzes (collectively "plaintiffs"), parents of Brittney and Shelby Sitzes, brought this action against Officer James Wright of the West Memphis, Arkansas, Police Department (WMPD), the City of West Memphis, and various city officials (collectively "defendants"). They alleged constitutional and state tort claims arising out of a traffic accident in which a patrol car driven by Officer Wright struck the car driven by Brittney Sitzes, killing Brittney and severely injuring Shelby, her passenger. The district court[2] granted summary judgment in favor of the defendants on the plaintiffs' federal claims and dismissed without prejudice their state tort claims. For the reasons stated below, we affirm.

I.

We recite the facts of this tragic case in the light most favorable to the plaintiffs, the nonmoving parties.[3] Dovenmuehler v. St. Cloud Hosp., 509 F.3d 435, 437 (8th Cir. 2007). On February 21, 2007, Officer Wright was on duty as a patrolman assigned to the northwest ward of West Memphis. At approximately 4:00 p.m., a man called 911 to report that two people claiming to be Wal-Mart security officers had stolen $55 from him and his friend in the Wal-Mart parking lot. A WMPD dispatcher

_____

[1]The Honorable Roberto A. Lange, United States District Judge for the District of South Dakota, sitting by designation.

[2]The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

[3]The dissent correctly notes that the district court failed to properly view some of the evidence in the light most favorable to the plaintiffs. See infra at 15. Since our review is de novo, this does not, by itself, constitute reversible error.

broadcast over the radio that there were men posing as security at Wal-Mart, and WMPD Officer Charles Mark McDougal indicated that he would respond. Officer Wright also heard this radio dispatch and stated that he would respond as well.[4] Shortly thereafter, the man called 911 again and told the dispatcher that one of the alleged robbers had assaulted him. This information was also relayed over the police radio, at which time a third officer indicated that she was also en route to the scene.

In traveling to Wal-Mart, Officer Wright drove north on Rich Road, a residential street with a posted speed limit of 30 m.p.h. Witnesses estimated that Officer Wright was traveling at 80-90 m.p.h., well above the posted speed limit. Witnesses also stated that Officer Wright had neither his emergency lights nor his siren activated at the time, a fact that Officer Wright disputes. As he approached the intersection of Rich Road and Arlington Road, Officer Wright was traveling in the southbound (opposing) lane of traffic, attempting to pass cars traveling northbound. At the intersection of Rich and Arlington Roads there are no stop or yield signs for drivers on Rich Road, but there are stop signs for drivers on Arlington Road. Officer Wright stated in an affidavit that he believed the situation at the Wal-Mart was an emergency which required driving in this manner.[5]

Unfortunately, at the same time, Brittney Sitzes was also driving north on Rich Road ahead of Officer Wright, with her younger sister Shelby in the passenger seat.

---

[4]Although the district court stated that Officer Wright was traveling to Wal-Mart because of a request for backup, Officer Wright testified in his deposition that it is WMPD policy for two patrol cars to respond to every call and that he decided to respond because the Wal-Mart was in his assigned ward and he felt it would be his responsibility to take the report. Officer McDougal did later make a request for backup, but only after Officer Wright's accident.

[5]Officer Wright's affidavit was filed as an exhibit to his motion for summary judgment well after Officer Wright's deposition. Plaintiffs conceded that Officer Wright made this statement but argued that the evidence did not support his belief.

As Brittney approached the intersection with Arlington Road, she slowed and began to make a left-hand turn onto Arlington Road. As Officer Wright entered the intersection, he struck the driver's side of Brittney's car as she executed her turn. Brittney was killed in the accident, and Shelby sustained severe injuries.

In February 2008, plaintiffs filed this action on behalf of Shelby and Brittney's estate against Officer Wright, the City of West Memphis, and several city officials. They alleged various state law and constitutional violations, including conspiracy, failure to train, failure to supervise, and a substantive due process claim under 42 U.S.C. § 1983. In its April 10, 2009, opinion, the district court granted summary judgment to the defendants on plaintiffs' federal claims and dismissed without prejudice their state law claims.[6] First, the district court granted summary judgment on plaintiffs' conspiracy claim under the intracorporate conspiracy doctrine. See Meyers v. Starke, 420 F.3d 738, 742 (8th Cir. 2005) (noting that "the intracorporate conspiracy doctrine . . . allows corporate agents acting within the scope of their employment to be shielded from constituting a conspiracy under [42 U.S.C.] § 1985" and that the doctrine has been "extended . . . to governmental entities"). Second, the court held that Officer Wright did not have the intent to harm Brittney or Shelby when he struck their car, therefore his actions did not rise to the conscience-shocking level needed to sustain a substantive due process claim. Finally, because there was no underlying constitutional violation, the court granted summary judgment on the failure to train and failure to supervise claims against the city.

Plaintiffs appeal the district court's grant of summary judgment. They argue that the district court used an improper standard of culpability in determining whether

_____

[6]The district court made certain to note that the Arkansas savings statute, Ark. Code Ann. § 16-56-126, protects plaintiffs' state law claims from any statute of limitations problems. See Sitzes v. City of W. Memphis, Ark., No. 3:08-CV-00026, slip op. at 7 n.34 (E.D. Ark. Apr. 10, 2009) (citing Carton v. Mo. Pac. R.R., 747 S.W.2d 93 (1988)). To our knowledge, plaintiffs' state law claims remain active.

Officer Wright's actions rise to the conscience-shocking level needed to establish a substantive due process claim and that there are genuine issues of material fact as to whether Officer Wright was responding to an emergency situation. Plaintiffs also argue that the district court erred in refusing to consider their failure to train and failure to supervise claims.

## II.

We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party. See Irving v. Dormire, 586 F.3d 645, 647 (8th Cir. 2009). We will affirm the grant of summary judgment if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Disputes that are not "genuine," or that are about facts that are not "material," will not preclude summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Our starting point for analyzing this type of substantive due process case is the Supreme Court's decision in County of Sacramento v. Lewis, 523 U.S. 833 (1998). In Lewis, the parents of Philip Lewis, a16-year-old motorcycle passenger who was killed during a high-speed pursuit by police, brought a § 1983 action alleging a deprivation of Lewis's Fourteenth Amendment substantive due process right to life. Id. at 836-37. The district court granted summary judgment to the police officer on the basis of qualified immunity, id. at 837-38, but the Ninth Circuit reversed, "holding that the appropriate degree of fault to be applied to high-speed police pursuits is deliberate indifference to, or reckless disregard for, a person's right to life and personal security[.]" Id. at 838 (quotation omitted).

The Supreme Court reversed, holding that "in a high-speed automobile chase aimed at apprehending a suspected offender . . . only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct

shocking to the conscience, necessary for a [substantive] due process violation." Id. at 836. In doing so, the Court identified a continuum of culpability in the substantive due process context. See id. at 848-50. At one end of the continuum is negligent conduct, which "is categorically beneath the threshold of constitutional due process." Id. at 849. At the other end is "conduct intended to injure in some way unjustifiable by any government interest," which is the type "of official action most likely to rise to the conscience-shocking level." Id. Between those poles lies culpability for "something more than negligence but less than intentional conduct, such as recklessness or gross negligence," id. (quotations omitted), which, in at least some circumstances, states a substantive due process claim, id. (citing City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983)).

The Court rejected this "midlevel" culpability standard in the context of high-speed police pursuits. Id. at 853-54. Analogizing such pursuits to prison riots, the Court refused to impose liability for deliberate indifference to human life "when unforseen circumstances demand an officer's instant judgment," such as when deciding whether to pursue a fleeing suspect. Id. at 853. Instead, imposing substantive due process liability based on deliberate indifference is only appropriate "when actual deliberation is practical." Id. at 851. Thus, the Court held that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment[.]" Id. at 854.

We applied this ruling in Helseth v. Burch, 258 F.3d 867 (8th Cir. 2001) (en banc). There, a driver was seriously injured when a suspect who was being pursued by police slammed into the driver's pickup truck. Id. at 869. The driver brought a § 1983 claim against the pursuing officer. Id. In reversing the district court's denial of qualified immunity, we held that "Lewis plainly stated that the intent-to-harm standard, rather than the [lower] deliberate indifference standard, applies to *all* high-speed pursuits aimed at apprehending suspected offenders[,]" regardless of whether the officer truly had "ample time to deliberate." Id. at 871.

We applied the Lewis intent-to-harm standard again in Terrell v. Larson, 396 F.3d 975 (8th Cir. 2005) (en banc). There, deputy sheriffs, responding to a report of a woman threatening to harm her three-year-old daughter, drove through an intersection at approximately 60 m.p.h. and struck Talena Terrell's car, killing her. Id. at 977. Terrell's heirs brought a § 1983 action against the officers, alleging that their decision to respond and the operation of their vehicle violated Terrell's substantive due process rights. Id. The deputies moved for summary judgment, arguing that the plaintiffs had no evidence that the deputies intended to harm Terrell. Id. The district court held that summary judgment was improper because there was a dispute of fact as to whether the deputies were responding to an emergency. Id. at 977-78.

We reversed the district court, noting that "[t]he deliberate indifference standard is sensibly employed only when actual deliberation is practical[,]" id. at 978 (quoting Lewis, 523 U.S. at 848-49), and that "[b]y contrast, the intent-to-harm standard most clearly applies in rapidly evolving, fluid, and dangerous situations which preclude the luxury of calm and reflective deliberation[,]" id. (quoting Neal v. St. Louis County Bd. of Police Comm'rs, 217 F.3d 955, 958 (8th Cir. 2000)). In reversing, we expanded Lewis's holding in two significant respects. First, we held "that the intent-to-harm standard of Lewis applies to an officer's decision to engage in high-speed driving in response to other types of emergencies [besides the high-speed pursuit of a fleeing suspect], and to the manner in which the police car is then driven in proceeding to the scene of the emergency." Id. at 979. This extension of the intent-to-harm standard to situations other than high-speed pursuits was in line with other circuits that had considered the issue. See id. (citing cases). Second, because "substantive due process liability . . . turns on the government official's evil intent," we rejected the district court's objective consideration of what constituted an emergency and "conclude[d] that [the] issue turns on whether the deputies subjectively believed that they were responding to an emergency." Id. at 980. Because it was undisputed that the deputies believed they were responding to an

emergency, the intent-to-harm standard was appropriate. Id. We left for another day the question of "whether a different rule should apply if an official's claim of perceived emergency is so preposterous as to reflect bad faith." Id. at 980 n.2.

It is against this legal background that we examine the present case. To establish a substantive due process violation, plaintiffs must show that "the behavior of [Officer Wright was] so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Lewis, 523 U.S. at 847 n.8. Whether actions rise to this conscience-shocking level is contextual, depending in large part on the level of culpability plaintiffs must prove that Officer Wright possessed. Terrell, 396 F.3d at 978. We must also keep in mind that substantive due process liability is narrow, applying only to the most egregious conduct, and that "the Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States[.]'" Lewis, 523 U.S. at 848 (quoting Paul v. Davis, 424 U.S. 693, 701 (1976)). "Because the conscience-shocking standard is intended to limit substantive due process liability, it is an issue of law for the judge, not a question of fact for the jury." Terrell, 396 F.3d at 981; see also Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992).

The district court, relying primarily on Terrell, held that the Lewis intent-to-harm standard applied to Officer Wright's conduct. The court further held that Officer Wright was responding to an emergency and that, because there was no evidence that he intended to harm Brittney or Shelby, summary judgment was appropriate. Plaintiffs argue that this is not the type of situation to which the intent-to-harm standard properly applies. They argue that Officer Wright was responding to a nonemergency call, that he had time to evaluate his actions, and that we should not effectively absolve him from substantive due process liability based on his self-serving statement that he believed the situation at the Wal-Mart to be an emergency. Thus, plaintiffs argue that the lower deliberate indifference standard should apply here. Officer Wright counters that Terrell forecloses any inquiry into whether the

situation was objectively an emergency, and that his affidavit, stating that he believed he was responding to an emergency, is sufficient to require application of the intent-to-harm standard.

Although we are deeply troubled by Officer Wright's actions, we cannot say that the district court erred in applying the intent-to-harm standard in this case. First, we must reject plaintiffs' primary argument, which bases liability on the situation at Wal-Mart not being a "true" emergency. Terrell forecloses inquiry into the objective nature of the emergency, as substantive due process liability turns on the intent of the government actor. 396 F.3d at 980. Thus, the fact that the situation at the Wal-Mart was not as serious as those presented in Helseth or Terrell, or that it might not qualify as an "emergency" under the WMPD Policy and Procedure manual, is not determinative of the appropriate level of scrutiny. Neither is the fact, emphasized by the dissent, that Officer McDougal and others testified that they would never have driven in the manner that Officer Wright did, or that Officer McDougal responded to the situation at the Wal-Mart differently than Officer Wright. This would all be more relevant if our question was whether the situation was an objectively "true" emergency. However, it bears little relevance to the question of what Officer Wright subjectively believed, and is emblematic of the kind of "fact-intensive, hindsight-oriented approach" that is inappropriate in this context. Helseth, 258 F.3d at 871 n.2.

Second, although Officer Wright arguably had more time to deliberate on his actions than would an officer engaged in a high-speed pursuit, we do not "reject intent-to-harm as the governing standard whenever a judge or a jury could say, with the wisdom of hindsight, that an officer engaged in a high-speed pursuit had ample time to deliberate." Id. at 871 (quotation omitted). In Terrell, we held that officers who were ten miles away from the reported disturbance, who were eating dinner at a police substation at the time they received the call, and who were told twice by the police dispatcher that they need not respond to the call, nevertheless did not have "the luxury of calm and reflective deliberation" in deciding whether or not to respond. 396

F.3d at 978 (quotation omitted). Because the officers had to "make a quick decision how best to protect the public and maintain lawful order," we held that the intent-to-harm standard governed their actions. Id. at 979. The officers in Terrell clearly had more time to deliberate on their actions than Officer Wright did here. Thus, the amount of time Officer Wright had to deliberate on his actions is not, by itself, sufficient to render the intent-to-harm standard inapplicable.

Third, even assuming, as we must, that Officer Wright had neither his emergency lights nor his siren in operation, the fact remains that the only direct evidence of Officer Wright's subjective belief—his affidavit—indicates that he *did* perceive the situation at Wal-Mart to be an emergency. Recognizing this, plaintiffs and the dissent argue that we should not take Officer Wright's belief at face value and that the fact that he did not have his emergency lights or siren activated is evidence that he did not truly perceive this to be an emergency. Although the plaintiffs did not stipulate in the district court that Officer Wright subjectively believed he was responding to an emergency, they did not question this belief at his deposition. Indeed, in their response to the defendants' Joint Statement of Material Facts Not in Dispute, they admitted that Officer Wright stated in his affidavit that he believed the situation to be an emergency, but argued that "the evidence is overwhelming that it was not." This is a challenge to the *objective* nature of the situation at the Wal-Mart, not the sincerity of Officer Wright's *subjective* belief. Thus, it appears that the question of Officer Wright's subjective belief may not have been presented to the district court. Likewise, on appeal, plaintiffs focus almost exclusively on the objective reasonableness of Officer Wright's avowed belief that he was responding to an emergency. Nevertheless, the dissent argues that a jury should have examined the veracity of Officer Wright's professed belief, along with its objective reasonableness. Although Officer Wright's failure to engage his emergency lights and siren is arguably incompatible with a belief that he was responding to an emergency, we conclude that an inquiry into the objective reasonableness of Officer Wright's belief

is contrary to the intent of Terrell, which is to insulate police officers from liability when they believe they are responding to an emergency call.

Terrell implied, but did not explicitly hold, that a different rule might apply "if an official's claim of perceived emergency is so preposterous as to reflect bad faith." 396 F.3d at 980 n.2. In essence, this requires us to take at face value an officer's characterization of a situation as an emergency in all but the most egregious cases. Although this case approaches that bad faith line, it does not cross it. Viewing the record in the light most favorable to the plaintiffs, Officer Wright's belief that the theft of property and assault that occurred in the Wal-Mart parking lot constituted an emergency was likely mistaken and perhaps even unreasonable. Were it not for the language in Terrell, this unreasonableness might be enough to remove this case from the intent-to-harm realm of cases. However, we are bound by Terrell, and we find that Officer Wright's belief is not so preposterous as to reflect bad faith. Rather, the situation at Wal-Mart "lies somewhere in the vast middle ground," Green v. Post, 574 F.3d 1294, 1301 n.7 (10th Cir. 2009), between "clear" emergencies and "clear" nonemergencies. As such, the unreasonableness of Officer Wright's belief is not enough to render the intent-to-harm standard inapplicable here.

We agree with the dissent that our opinion should not be read to establish a rule that an officer can insulate himself from substantive due process liability, no matter the circumstances, by simply averring that he subjectively believed the situation to which he was responding was an emergency. See Terrell, 396 F.3d at 980 n.2. This could lead to the absurd results forecasted by the dissent. For example, the dissent fears that this case could be used to insulate from substantive due process liability an officer who drove "100 miles per hour through a children's playground during recess time," or an officer who drove "the wrong way down an interstate highway . . . when responding to something as routine as a reported accident requiring traffic control[,]" as long as the officer stated that he believed the situation to be an emergency. Infra at 28. First, such cases are far beyond the factual scenarios of Lewis, Helseth, and

-11-

Terrell, which involved officers using conventional emergency driving techniques to respond to perceived emergencies. Nothing in our opinion would countenance granting summary judgment in either of the two situations presented by the dissent. Second, we think it very likely that an officer who intentionally drove through a playground or the wrong way on an interstate highway could be held liable even under the intent-to-harm standard, regardless of the officer's avowed belief, at least absent some compelling exigency not described in the hypotheticals. In sum, we do not understand this case to establish a per se rule that an officer's self-serving affidavit will always insulate that officer from substantive due process liability. Instead, we simply hold that the plaintiffs have failed to create a genuine issue of fact as to Officer Wright's subjective belief and that this belief is not so preposterous as to reflect bad faith on the part of Officer Wright.

The dissent also cites two qualified immunity cases, Moore v. Indehar, 514 F.3d 756 (8th Cir. 2008), and Felder v. King, 599 F.3d 846 (8th Cir. 2010), for the proposition that, in some contexts, we look beyond an officer's professed subjective belief. Both cases dealt with officer-involved shootings and held that factual questions precluded summary judgment on the plaintiffs' § 1983 Fourth Amendment claims for excessive force. Importantly, neither case involved a substantive due process claim governed by Lewis, Helseth, and Terrell. Moreover, Felder was governed by the Fourth Amendment's *objective* reasonableness standard, see Graham v. Connor, 490 U.S. 386, 388 (1989), not the subjective standard at issue here. Thus, the fact that, in those cases, there was evidence sufficient to create a genuine issue of material fact does little to affect our analysis here.

For the reasons stated above, we hold that the intent-to-harm standard applies as a matter of law to Officer Wright's conduct.[7] Because there was no evidence that

---

[7]Although we hold that the intent-to-harm standard applies to Officer Wright's conduct, we question whether the plaintiffs could have prevailed even under the deliberate indifference standard. See Green v. Post, 574 F.3d 1294, 1296-97, 1303-04

-12-

Officer Wright intended to harm Brittney or Shelby Sitzes, the district court correctly granted summary judgment in favor of the defendants. While accidents such as this are tragic, they "do not shock the modern-day conscience." Terrell, 396 F.3d at 981. As such, they cannot form the basis of substantive due process liability.[8]

The district court also granted summary judgment to the defendants on plaintiffs' failure to train and failure to supervise claims, holding that such claims could not be sustained absent an underlying constitutional violation by the officer. We agree. See City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978) ("Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."); Sanders v. City of Minneapolis, Minn.,

---

(10th Cir. 2009) (deputy sheriff's actions of traveling through an intersection at a high rate of speed, without his lights or sirens on, in response to a non-emergency call held to be negligent but not conscience-shocking under the deliberate indifference standard); Leddy v. Twp. of Lower Merion, 114 F. Supp. 2d 372, 374, 376 (E.D. Pa. 2000) (officer's actions of traveling at an excessive rate of speed, without his lights or sirens on, in response to a report of a suspicious parked vehicle held to be negligent or even reckless, but not conscience-shocking under the deliberate indifference standard); Daniels v. City of Dallas, 272 F. App'x 321, 322-23 (5th Cir.) (unpublished per curiam), cert. denied, 129 S. Ct. 648 (2008) (officer's high-speed response to a nonemergency call, where he did not engage his lights or sirens, held not to be conscience-shocking under either intent-to-harm or deliberate indifference standard).

[8]Nothing in our opinion should be read to minimize the tragic nature of this accident. Viewing the record in the light most favorable to the plaintiffs, Officer Wright's actions were perhaps negligent, even reckless. Arguably, were it not for Officer Wright's profoundly poor judgment, this accident would not have happened. Nonetheless, we are bound to apply the law as we understand it, remembering that "the Fourteenth Amendment is not a font of tort law." Lewis, 523 U.S. at 848 (quotation omitted). Thus, we hold that Officer Wright's actions do not rise to the conscience-shocking level needed to sustain a substantive due process claim, and we leave the plaintiffs to their state law remedies.

-13-

474 F.3d 523, 527 (8th Cir. 2007) ("Without a constitutional violation by the individual officers, there can be no § 1983 or <u>Monell</u> failure to train municipal liability.").

III.

For the reasons stated above, we affirm.

LANGE, District Judge, dissenting.

I respectfully dissent because when the record is appropriately viewed in the light most favorable to the Plaintiffs, a genuine dispute of material fact exists over whether Officer James Wright was truthful in professing a subjective belief that he was responding to an emergency when the collision that killed Brittney Sitzes occurred. Thus, under <u>County of Sacramento v. Lewis</u>, 523 U.S. 833 (1998) and existing precedent, a question of fact exists that makes it improper to apply the intent-to-harm standard as a matter of law.

## I.  Material Facts.

### A.  The District Court Did Not Apply Rule 56 Properly in its View of the Facts.

This case involves an appeal from a grant of summary judgment. Summary judgment is only appropriate when the record demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. On appeal, this Court considers a grant of summary judgment de novo, applying the same standards as a district court. <u>Grayson v. Ross</u>, 454 F.3d 802, 808 (8th Cir. 2006). That is, both before the district court and on appeal, the court is obliged to construe the "record in the light most favorable to the

non-moving party . . . and . . . afford [the non-moving party] all reasonable inferences to be drawn from that record." Davis v. Hall, 375 F.3d 703, 711 (8th Cir. 2004). Viewed in the light most favorable to the non-movants, the record reveals genuine disputes over whether Officer Wright is credible in his assertion that he subjectively believed that he was responding to an emergency.

The district court did not consider the facts in the light most favorable to the Plaintiffs. Indeed, the district court did not even note that there was a dispute over Officer Wright's claimed belief that he was responding to an emergency. The district court's background facts consisted of twelve sentences, three of which fail to properly view the facts in the light most favorable to the non-movant. First, the district court stated that Wright "received a request for backup in apprehending suspects." In reality, the collision at issue occurred before the call for backup. Second, the district court assumed that Officer Wright "turned on his patrol car's emergency blue lights and siren," when no fewer than four eyewitnesses swore in affidavits that they heard no siren and no lights from Officer Wright's car. Third, the district court opinion accepted as true that Wright acted, "believing that he was responding to an emergency situation." Although the Defendants maintained in a joint statement of material facts that "Wright subjectively believed he was responding to an emergency situation," the Plaintiffs contested that claim with a response stating: "It is admitted that Wright asserts that, however, the evidence is overwhelming that it was not and the transcript only shows [that information provided to Wright was a call about] posing as security and had left the scene."

The majority opinion in this case properly recognizes the summary judgment standard and construes certain facts in favor of the Plaintiffs. However, the majority opinion does not set forth all of the material facts that undermine Officer Wright's credibility and raise genuine issues of material fact about his assertion of a subjective belief that an emergency existed.

-15-

**B. Full Recitation of Material Facts in Light Most Favorable to Non-Movant.**

Because a key question in this case is whether Officer Wright's professed subjective belief of an emergency is to be credited, some background on Officer Wright's credibility and conduct is necessary. Before the tragic death of Brittney Sitzes on February 21, 2007, other officers of the West Memphis Police Department ("WMPD") had complained about the cocky, arrogant, and argumentative attitude of Officer Wright. WMPD officers reported that they did not want to ride with Officer Wright. Shortly before the incident, the WMPD chief of police had informed Officer Wright that his status as an officer was under advisement because of a picture that Wright had posted on MySpace. The picture showed Officer Wright, in his police uniform, holding his service revolver in a shooting position pointed at the camera.[9]

On February 14, 2007, one week before the tragic collision at issue in this case, Officer Wright was involved in a somewhat similar motor vehicle accident with Dominique Robinson.[10] According to the affidavit of Robinson, he was driving his vehicle when "out of nowhere, a police car with no emergency sirens or flashing lights driven by Officer Wright went into the middle lane of traffic traveling at an extremely

---

[9]Officer Wright after the accident posted an image containing four pictures on Facebook. The Facebook posting showed the same picture of Officer Wright pointing his service revolver at the camera. Above Officer Wright is an image of a WMPD patrol car with its lights flashing. To the right of Officer Wright is a skull with the legend "the PUNISHER." The Punisher is an "antihero," created by Marvel Comics in 1974 as an antagonist to Spider-Man. The Punisher "is a vigilante who considers killing, kidnapping, extortion, coercion, threats of violence, and torture to be acceptable crime fighting tactics." http://en.wikipedia.org/wiki/Punisher (last visited April 30, 2010). Just above the image of the skull is a picture of a person wearing the garb of the Punisher with guns in each hand.

[10]Officer Wright previously had received a Letter of Reprimand and citation for another motor vehicle collision involving his police cruiser on July 26, 2006.

-16-

high rate of speed." Wright's police car struck Robinson's vehicle in the driver's side rear, spun Robinson's vehicle around, then traveled another 100 feet, struck a parked vehicle, and pushed it into another parked vehicle. The WMPD police chief on February 14 warned Officer Wright that he might be terminated and Officer Wright was taken off duty from February 14 until February 21, 2007.

Having been informed that his status as an officer was under advisement and on his first day back on duty following the February 14 motor vehicle accident, Wright was on duty on the afternoon of February 21, 2007. At around 3:45 that afternoon WMPD dispatch received a 911 call from Trenton Lemons, who reported that "people . . . claiming they work . . . at Wal-Mart in their security" had taken $50 or $55 from Lemons' friend's pocket and were walking away. The WMPD dispatcher had radio communication with Officer Charles Mark McDougal as follows: "798 West Service Road [Wal-Mart location]. Make contact with Trenton Lemons. This is going to be the garden center. (unintelligible) posing as security." Officer McDougal, who was assigned to cover the city as a whole, was the closest WMPD officer to the Wal-Mart at the time. Officer Wright, whose assigned area that afternoon included the Wal-Mart, but who evidently was not very close to the store, heard the call and responded that he would be in route too. Officer Wright wanted to take the report, according to his testimony, because the Wal-Mart was in his ward of the city.

The difference between how Officer McDougal and Officer Wright responded to the call is telling. Officer McDougal, who was approximately a mile and a half to two miles away from the Wal-Mart at the time of the call, drove at a normal speed and stopped at all stop signs going to the Wal-Mart. Officer McDougal did not have his lights on and described the call as "not that urgent of a call." Officer McDougal testified: "This call didn't justify any exorbitant speed or anything like that in my opinion."

By contrast, having heard the same initial call, Officer Wright responded aggressively, turned onto a residential road, accelerated to a speed at least 50 miles over the speed limit, and traveled at times in the wrong lane to pass other vehicles. Officer Wright twice in his deposition mischaracterized the dispatch call, testifying that it was "armed robbery suspects fleeing."[11]

Trenton Lemons made a second 911 call to dispatch, which the officers would not have heard over the radio. During the call, Lemons identified himself as the person who had just called about someone taking $55. Lemons had confronted one of the two people, who in turn had pushed Lemons in the chest in a way where Lemons was struck in the face. Lemons reported that the security guard imposters were fleeing in an older red car with an Arkansas license plate. The dispatcher reported over the police radio the new report of an assault with the suspects leaving in a vehicle. In addition to Officer McDougal, a second WMPD officer arrived at or was nearly at the Wal-Mart. Officer McDougal spotted the red car and was in the process of calling in for backup because he was unsure whether the red car would stop. As Officer McDougal was making the call for backup, Wright broke in with "Get me an ambulance! Ambulance! Rich and Arlington. Rich and Arlington." Officer McDougal testified that his call for backup came after the point of Wright's collision. Officer Wright testified that he never heard the call for backup because his police radio was not operable following the crash, and his request for an ambulance was made on a hand-held device approximately 10 to 15 seconds after impact.

---

[11]Officer Wright's deposition testimony at pages 81 and 101 both refer to the dispatch call as describing an armed robbery. The dispatch call did not describe an armed robbery, and the individuals who had posed as security guards at Wal-Mart were unarmed when apprehended by Officer McDougal. In his statement for the police report of the accident, Officer Wright wrote that he was responding to an assault and he did not refer to an armed robbery.

To get to the Wal-Mart, Officer Wright had turned on Rich Road, which is a residential street with two lanes and no center line and a speed limit of 30 miles per hour. On Rich Road there are primarily single-family homes, along with schools, a sign indicating children at play, and commonly people out and about in the late afternoon. Officer Wright, who grew up in West Memphis and testified he was very familiar with the neighborhood, was traveling at least 79 miles per hour down Rich Road northbound in a southbound lane in his 2006 Ford Crown Victoria police car. Up ahead of Wright's car, Brittney Sitzes ("Brittney") was driving a 2001 Oldsmobile Alero northbound on Rich Road, with her little sister Shelby Sitzes ("Shelby") as a passenger. Brittney was in the process of making a left turn from Rich Road to Arlington Road, when Officer Wright's patrol car struck the driver's side door. The momentum of Wright's car pushed the Sitzes car sideways 142 feet, until it slammed up against a tree in a resident's front yard. Wright's car then separated from the Sitzes car and traveled another approximately 84 feet across the street to the northeast. Brittney died at the scene, and her sister Shelby was seriously injured.

Eyewitnesses are split on whether Officer Wright even had his lights and sirens on before the collision. A person out for a jog along Rich Road described a first vehicle coming through with lights and sirens on and then a second vehicle "traveling at the excessively dangerous high rate of speed of 80 to 90 miles per hour never slowing at the intersection and passing several cars in the process," causing the accident. This jogger described the neighborhood as one full of "children and pedestrians, joggers, and bicycling," and "within about a mile of several schools, and an elementary school," with "children going home from school around the time of the accident." Four people living on Rich Road were outside their houses at the time of the accident; all four testified that they did not hear any siren or see any emergency lights prior to impact, although one remembers hearing a "whoosh" sound just before the impact. After the impact, these people saw no lights on the patrol car and heard no siren from Officer Wright's car. The majority decision properly infers, taking the facts in the light most favorable to the non-movants, that Officer Wright did not have

his lights and siren on at the time.[12]  Wright testified that he was able to get out of his vehicle and called for assistance right away.

The investigation of the accident was done by Arkansas Highway Patrol Officer Flarcell Tate ("Trooper Tate").  Trooper Tate testified that, based on the physical evidence, Officer Wright was traveling at least 80 miles per hour at the time of the impact.  Trooper Tate testified that there was no circumstance where a police officer should be driving that fast on Rich Road "even if there is a bomb ticking at an elementary school."  An accident reconstruction expert later estimated the speed of the Wright vehicle at impact at between 79 and 86 miles per hour based on the physical evidence.

Officer McDougal, who as stated above heard the same radio calls and deemed it "not that urgent"[13] and one that did not "justify any exorbitant speed," expressed "shock" that someone would drive 70 to 80 miles per hour on Rich Road, which he noted was a street where people, including children, are frequently outside during the day.  A West Memphis city council member testified in this case "that it would shock me to know that officers of the WMPD was [sic] traveling 80 miles per hour into opposing traffic, after school let out on Rich Road."

---

[12]There were motorists who pulled aside after hearing a police siren.  As with other issues in this case, an issue of fact exists here for trial.  However, the inference can and should be drawn based on Rule 56 of the Federal Rules of Civil Procedure that Wright did not have his lights and sirens on, which would be further circumstantial evidence that he did not truly believe the dispatched call to create an emergency situation.

[13]The WMPD Policy and Procedure manual contains a "Classification of Response," recognizing three categories of response: a) "Routine," where the response is to include obeying all traffic laws; b) "Urgent," where intermittent use of blue lights and sirens are used; and c) "Emergency," where continuous sirens and lights are used. The emergency response is for situations of officer down or needs assistance, serious felonies in progress and serious accidents, fires, or other circumstances with potential for disaster.

A sociologist hired as an expert by the Plaintiffs opined that "what Officer Wright heard on the radio presented a threat to the public that had either ended or was under control . . . his presence at the crime scene was not essential." The expert also opined: "The driving of Officer Wright was shocking, willful, wanton, displayed a total indifference to the public and himself. It served no legitimate law enforcement purpose."

## II.  Section 1983 Claim.

The Fourteenth Amendment to the United States Constitution protects against the government or a state actor, like Officer Wright, depriving a person of life, liberty or property without due process of law. Section 1983 provides for a cause of action in federal court for a violation of the substantive due process guarantee of the Fourteenth Amendment. Because the actions of the state, through on-duty police officer James Wright, were the cause of Brittney's loss of life and substantial injury to her sister Shelby, the substantive due process protection of the Fourteenth Amendment may be implicated here. See Ohio Adult Parole Authority v. Woodard, 523 U.S. 272 (1998).

The analysis of whether a claim exists under these circumstances begins with County of Sacramento v. Lewis, 523 U.S. 833 (1998). In Lewis, the Supreme Court of the United States considered whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through a high speed automobile chase aimed at apprehending a suspected offender. Id. at 836. The Court held that there was no violation of the Fourteenth Amendment under the circumstances in Lewis, because the police had no time to deliberate, did not intend to cause harm, and thus engaged in conduct that "does not shock the conscience." Id. at 855.

In Lewis, the police officers were in pursuit of a motorcyclist who had avoided a police stop and sped away. The Court in Lewis stated that a due process clause violation exists "only when [the police conduct] 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" Id. at 847 (citing Collins v. City of Harker Heights, 503 U.S. at 128). The Court in Lewis then noted that conduct intended to injure was most likely to be conscience shocking, and whether conduct of a lesser nature – "less than intentional conduct, such as recklessness or 'gross negligence'" – could justify a claim of a violation of substantive due process would be a closer call. Lewis, 523 U.S. at 849 (quoting Daniels v. Williams, 474 U.S. at 334, n.3). The Court in Lewis then emphasized that analysis of whether an actionable claim exists for violation of constitutional due process is a fact intensive decision. The Court in Lewis stated:

> Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking.

Id. at 850. The Court in Lewis then cited a previous case to the effect that a denial of due process rights is to be "tested by an appraisal of the totality of facts in a given case." Id. (quoting Betts v. Brady, 316 U.S. 455, 462 (1942)).

The Court in Lewis then clarified that "deliberate indifference" of a conscience shocking nature would support a due process claim "only when actual deliberation is practical." Id. at 851. However, for "sudden police chases," such as the one at issue in Lewis, a higher standard of conduct – an "intent to harm" – is necessary for there to be liability under the Fourteenth Amendment, redressable by an action under Section 1983. Id. at 854. In footnote 13 in Lewis, the Court further made clear that negligent use of an officer's vehicle is not a Section 1983 claim, but intentional misuse of the vehicle does support a Section 1983 claim. Id. at 854, n.13 (quoting

Checki v. Webb, 785 F.2d 534, 538 (5th Cir. 1986)).  The Court noted in closing that the officers' conduct in Lewis was an "instinctive response" to a motorist evading a stop and then speeding off.  Id. at 855.

In Helseth v. Burch, 258 F.3d 867 (8th Cir. 2001), and in Terrell v. Larson, 396 F.3d 975 (8th Cir. 2005), this Court applied and extended the ruling in Lewis.  In Helseth, the Court applied the intent-to-harm standard of Lewis to "all Section 1983 substantive due process claims based on the conduct of public officials engaged in a high speed automobile chase aimed at apprehending a suspected offender." Helseth, 258 F.3d at 871.  In Helseth, the police were in pursuit of an intoxicated driver who had sped past police cars at 111 miles per hour and then had engaged in driving designed to elude the police.  The intoxicated motorist ultimately collided with a vehicle driven by Plaintiff Helseth, killing Helseth's passenger and seriously injuring Helseth.  Thus, in both Lewis and Helseth, the high speed chases were aimed at apprehending motorists who had engaged in illegal conduct and were seeking to elude the police.  Under those circumstances, unquestionably, the "intent to harm" standard applies, as law enforcement officers must be allowed to pursue and stop motorists committing crimes in process without fear of suits over the consequences of such high speed chases of fleeing suspects.

The circumstances in Terrell were different.  In Terrell, a radio dispatcher transmitted a call that a 23-year-old female had locked herself and her 3-year-old child in a room and was threatening to harm the 3-year-old child.  Terrell, 396 F.3d at 977.  The dispatcher assigned the call a priority level three, described as a "very high priority."  Id.  Two sheriff's deputies were on duty, but eating at a substation ten miles away.  They responded to the call as backup, although they were told that they did not have to do so, and were going through an intersection, apparently against a red light, when they struck a vehicle and killed the driver.

In Terrell, the Court appropriately noted that the deliberate indifference standard "is sensibly employed only when actual deliberation is practical." Id. at 978 (quoting Lewis, 523 U.S. at 851). The Court also noted that "the intent to harm standard most clearly applies 'in rapidly evolving, fluid and dangerous situations which preclude the luxury of calm and reflective deliberation.'" Terrell, 396 F.3d at 975 (quoting Neal v. St. Louis County Bd. of Police Comm'rs, 217 F.3d 955, 958 (8th Cir. 2000)). The Court then noted that the officers were responding to an "emergency domestic disturbance," and such situations are "'notoriously volatile and unpredictable.'" Id. at 979 (quoting Elwood v. Rice County, 423 N.W.2d 671, 678 (Minn. 1988)). The Terrell court then noted that the number of police officers needed to defuse an emergency domestic disturbance rarely would be known in advance and that officers would have to make quick decisions akin to those made by the officers in Lewis, because "responding to this type of emergency call [does not provide] 'the luxury . . . of having time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations.'" Id. at 979 (quoting Lewis, 523 U.S. at 853). After all, Terrell involved a call of a three-year-old being held hostage in a room by someone threatening to do harm to the child. The circumstance, as with pursuing a motorist actively fleeing the police, is a different type of situation, indeed is an emergency, unlike the initial call about people impersonating security guards at Wal-Mart having taken $50 to $55 and walking away.

The Court in Terrell extended Lewis in determining that, in evaluating whether a deliberate indifference or intent-to-harm standard applies, the "issue turns on if the deputies subjectively believe that they were responding to an emergency." Id. at 980. In a footnote, the opinion stated that: "We need not consider whether a different rule should apply if an official's claim of perceived emergency is so preposterous as to

reflect bad faith." Id. at n.2.[14] In the case at hand, there is no evidence nor reason to believe that Officer Wright intended to harm Brittney and Shelby Sitzes. However, the true issue in this case is whether the affidavit in which Officer Wright stated his subjective belief that he was responding to an emergency deserves to be credited or is "so preposterous as to reflect bad faith." On this particular question, there exists a genuine dispute as to material fact and ample evidence to question the credibility of Officer Wright and his statement.

The record supports the inference that Officer Wright, according to complaints from his fellow officers, was cocky and arrogant and had poor judgment and a propensity to not consider the consequences of his conduct. The WMPD had

---

[14]The decision in Terrell cited no authority for either this proposition or the subjective belief proposition. The Terrell decision was an en banc decision, in which Judges Lay, Heaney and Bye dissented and noted on this point the following:

> The majority creates an unknown rule of law that requires the § 1983 plaintiff, at the summary judgment stage, to establish the officer's subjective state of mind regarding the existence of an emergency. While we agree with the majority that a Section 1983 plaintiff must establish an "evil intent" in the form of criminal recklessness under the deliberate indifference standard to establish ultimate liability, we part company with the majority when it states that judicial review of the facts surrounding the case must start and end with an inquiry into the officer's subjective state of mind. We note the majority cites no authority for this novel approach.

Terrell, 396 F.3d at 982 n.3 (Lay, Circuit Judge, dissenting). Footnote 2 in the opinion in Terrell is dicta. By its terms the opinion noted this was something the Court did not need to consider. Terrell cannot and should not be read to create a rule where a statement in an affidavit about an officer's subjective belief completely negates substantial contradictory evidence, or that the principles of Rule 56 do not apply to determine whether a question of fact exists on whether the officer truly believed an emergency existed.

chastised him for posting on MySpace a picture of himself in his police uniform pointing his service revolver at a camera. He subsequently posted the same picture on Facebook with a picture of a WMPD patrol car and images from the Punisher, a fictional character that acts without regard to consequences and metes out justice in vigilante fashion without regard to law.

One week before the accident at issue, Officer Wright had been involved in a substantially similar motor vehicle accident, where he was speeding through an intersection without lights and sirens on, and without being mindful of another motorist. He was warned that his status as an officer was under advisement and was off duty until the day of the accident.

At the time of the radio call, Officer Wright was not the one closest to the Wal-Mart store, even though the Wal-Mart store was in his assigned area. Officer McDougal was the closest and Officer Tatum apparently was closer as well. The motives of Officer Wright in responding in the manner he did are subject to question. A reasonable inference from this record can be drawn that Officer Wright was rushing to get to the scene, not because he truly perceived it as an emergency, but rather because it was in his assigned area and he wanted to write the police report, his status as an officer was under advisement, it was his first day back on the job, he wanted to get to the scene of where some action was, and perhaps he enjoyed the adrenaline rush of driving in a reckless manner.

By contrast with the actions of Officer Wright, Officer McDougal, who heard the same call and was closest, did not exceed the speed limit, did not have his lights and sirens on, considered the call "not that urgent of a call," and testified that the call "didn't justify any exorbitant speed or anything like that." Officer McDougal's response was consistent with the nature of the call and the WMPD Policy and Procedure manual. The call did not qualify for an "emergency" response under those policies and procedures.

Officer Wright, the record reflects, misrepresented, or perhaps even lied, about the nature of the call. Twice during his deposition, he referred to it as an armed robbery call. The initial call was that someone was impersonating a security guard, and then there was a subsequent call (after Officer Wright already had chosen to drive recklessly) about there being an assault. The record, and the timing of the accident, is unclear as to whether he heard the second call prior to the collision.[15] In addition, Wright testified that he was unsure if he was going more than 30 miles per hour, which calls into question his credibility when accident reconstruction analysis puts Officer Wright's speed at between 79 and 86 miles per hour at impact.

There exists a question of fact, inappropriate for summary judgment, on whether the claimed subjective belief of the existence of an emergency is legitimate or is "so preposterous as to reflect bad faith." The evidence, when viewed in the light most favorable to the non-movants, indicates that Officer Wright – just like Officer McDougal did – had time to deliberate and realize that this call was not an emergency. Thus, the question becomes whether the conduct of Officer Wright constitutes deliberate indifference of a nature that is "conscience shocking, in a constitutional sense." Lewis, 523 U.S. at 847 (quoting Collins v. City of Harker Heights, 503 U.S. at 128). Tellingly, Officer McDougal testified that he would never drive down Rich Road, where people are walking and when children are out, at 70 to 80 miles per hour under any circumstance. Similarly, Trooper Tate, who investigated the accident, said he would never drive down Rich Road at 80 miles per hour, even if there was a bomb at an elementary school. A city council member and

[15]It is possible that Officer Wright heard the call about it being an assault before the collision. The call for backup from Officer McDougal, however, came contemporaneous with the motor vehicle accident and indeed Officer Wright breaks in during Officer McDougal's call to dispatch to call for an ambulance. Officer McDougal testified that his call for backup came after the collision involving Officer Wright had occurred, and Officer Wright acknowledged that he did not hear the call for backup because his radio was not operable following the collision.

expert similarly expressed shock at the driving of Officer Wright. The conduct of Officer Wright, likewise, shocks my conscience when the facts properly are viewed in the light most favorable to the Plaintiffs.

This Court cannot establish a rule, and indeed the majority decision should not be read to establish a rule, that an affidavit from an officer stating that he subjectively believed an emergency existed is enough to justify summary judgment and insulate the officer from any responsibility for controlling his vehicle.[16] A rule of this nature would emasculate the protection of the Fourteenth Amendment as it relates to conduct of officers with their vehicles. Indeed, if that were the law, an officer could avoid Section 1983 liability for driving 100 miles per hour through a children's playground during recess time, by stating that he subjectively believed there was an emergency and the path through the playground was the most direct to get to the claimed emergency. An officer could justify driving the wrong way down an interstate highway based on an affidavit stating a subjective belief of an emergency, when responding to something as routine as a reported accident requiring traffic control.[17] The decision in Lewis and the subsequent decisions from this Court in

---

[16]This writer takes some comfort that the majority opinion now makes clear that no such rule exists and that "an officer [cannot] insulate himself from substantive due process liability, no matter the circumstances, by simply averring that he subjectively believed the situation to which he was responding to be an emergency." With that being the case, a more complete consideration of the facts, as in this dissent, is required to evaluate whether a genuine issue of material fact exists over whether an officer's professed subjective belief of an emergency deserves to be credited.

[17]This writer again takes comfort that the majority now views these examples as ones where summary judgment would be inappropriate and, indeed, that such conduct may expose an officer to liability under the intent-to-harm standard. While these illustrations are "far beyond the factual scenarios of Lewis, Helseth, and Terrell," they are not so far removed from the situation in this case, where an officer drives on a residential street in the wrong lane of travel at approximately 80 miles per hour when there are pedestrians and other traffic present, has a history of misbehavior

Helseth and Terrell should not be read to insulate officers from Section 1983 liability based merely on an affidavit expressing a subjective belief of the existence of an emergency.

Indeed, other cases from this Court recognize that an officer's professed subjective belief does not control whether a Section 1983 case can survive summary judgment. For example, in the recent case of Moore v. Indehar, 514 F.3d 756 (8th Cir. 2008), the Court reversed a district court's grant of an officer's motion for summary judgment on qualified immunity grounds. In Moore, an officer had shot an unarmed man as he fled. Id. at 758. The injured person brought a Section 1983 claim. The officer testified that he was not firing at the unarmed plaintiff but at his armed companion who had fired shots. Id. at 761. The officer testified that he missed and accidentally hit the plaintiff's arm. Id. This Court reversed summary judgment because, viewing the facts in the light most favorable to the plaintiff, a genuine issue existed over the credibility of the officer's testimony. Id. at 761-62.[18]

Earlier this year, in Felder v. King, 599 F.3d 846 (8th Cir. 2010), this Court affirmed the denial of officers' motion for summary judgment on a qualified immunity defense notwithstanding the officers' testimony about their belief as to what was occurring. In Felder, the officers described having to shoot a person they

_____

of a similar ilk, and substantial evidence undermines the credibility of the officer's professed belief of an emergency, including the testimony of even his fellow officer responding to the same call.

[18]Among the evidence creating a genuine issue of material fact included the officer's training, which the Court found contradicted his testimony regarding his subjective belief. Id. at 762. Here, the WMPD Policy and Procedure manual required that officers responding to emergencies "shall respond quickly and safely to the call/incident utilizing blue lights and siren continuously to signal other vehicles." When coupled with eyewitness testimony that Officer Wright's lights and sirens were not activated, this evidence further reveals a genuine issue of material fact regarding his subjective belief.

had pursued and were apprehending because he had grabbed an officer's gun. Id. at 847-48. The Court in Felder noted eyewitness and expert testimony contradicting the officers' testimony of events. Id. at 848.[19]

As with Moore and Felder, this case presents a situation where an officer's testimony conflicts with other witnesses and evidence. Likewise, summary judgment is not appropriate here.

Without question, law enforcement officers deserve protection from Section 1983 suits for conduct that is taken without an opportunity to deliberate under situations that are actual emergencies. However, the situation in this case was not an emergency. Officer Wright's affidavit alone does not transform the situation into an emergency. This is not to imply that an objective standard should govern whether an emergency exists. Rather, when there is substantial evidence to create a question of fact as to whether the officer legitimately believed there to be an emergency such that the officer's credibility is in doubt, then summary judgment is inappropriate. Because issues of fact inappropriate for summary judgment exist here, I dissent with respect to summary judgment on the Section 1983 claim.

_____

[19]The majority notes that "Felder was governed by the Fourth Amendment's *objective* reasonableness standard." However, in Felder, the Court noted, "the officers do not make a legal argument that . . . their conduct at the 'critical time' was objectively reasonable. Instead, they insist that their account of the 'critical time' controls." 599 F.3d at 849. The Court in Felder did not summarily credit the officers' accounts, but found there to be a genuine dispute as to whether the officers' accounts were credible. Both Moore and Felder stand for the proposition that an officer's professed subjective belief in a Section 1983 case may not justify summary judgment on its own, especially when there is evidence contradicting the professed subjective belief.

-30-